In re DARTMOUTH HOUSE NURSING
HOME, INC., Debtor.

The COMMONWEALTH OF MASSA-
CHUSETTS, Plaintiff,

v.

DARTMOUTH HOUSE NURSING
HOME, INC., Defendant.

In re ERLIN MANOR NURSING
HOME, INC. d/b/a, Debtor.

The COMMONWEALTH OF MASSA-
CHUSETTS, Plaintiff,

v.

ERLIN MANOR NURSING HOME,
INC., d/b/a, Defendant.

In re ST. JOHN'S NURSING
HOME, INC., Debtor.

The COMMONWEALTH OF MASSA-
CHUSETTS, Plaintiff,

v.

ST. JOHN'S NURSING HOME,
INC., Defendant.

Bankruptcy Nos. 81–02344–JG
to 81–02346–JG.
Adv. Nos. A82–0155 to A82–0157.

United States Bankruptcy Court,
D. Massachusetts.

Sept. 30, 1982.

MEMORANDUM

JAMES N. GABRIEL, Bankruptcy Judge.

The debtors, Erlin Manor Nursing Home, Inc. (Erlin Manor), St. John's Nursing

Home, Inc. (St. John's) and Darmouth House Nursing Home, Inc. (Darmouth) filed voluntary petitions under Chapter 11 (Reorganization) of Title 11 of the United States Code, 11 U.S.C. Section 101 *et seq.* (The Bankruptcy Code) on December 31, 1981.

The Plaintiff, Commonwealth of Massachusetts, by its Department of Public Welfare (Welfare), commenced this adversary proceeding seeking declaratory judgment as to its right to make setoffs of the current monthly medicaid payments and retroactive payments owed the debtors against the debtors' liabilities for past Medicaid overpayments.

On March 5, 1982, the debtors filed answers. On March 12, 1982 the debtors each filed a Motion for Contempt and to Compel Turnover and to Enjoin Setoff, seeking to restrain further setoff by Welfare. On March 12, 1982, a pretrial conference on plaintiff's complaint was held, at which time the Court heard argument on the Debtor's motions. Also at this pre-trial conference, the parties agreed that since the adversary proceedings presented no factual disputes, the issues being purely legal, the parties would submit the cases to the Court for decision upon briefs, without further evidence or oral argument.

On March 17, 1982, the Court granted Debtors' request for a preliminary injunction and issued an Order restraining Welfare from setting off pre-petition debts against current reimbursement due the Debtors. An amended order clarifying the amount of setoff enjoined was issued on March 25, 1982.

The debtors are three individually incorporated nursing homes which furnish a variety of health care services to eligible persons under programs administered by Welfare, including the Massachusetts Medical Assistance Program (Medicaid). Each debtor is a "provider of health services" within the meaning of Massachusetts General Laws Chapter 6A Sections 31 through 36. The relationship between the debtors and Welfare has been governed by yearly Medicaid provider agreements between provider and Medicaid. Each debtor had been a party to a provider agreement since 1974. In fact, all three debtors rely on Medicaid reimbursement for most of their income; Medicaid payments comprise 52 percent of Dartmouth's income, 77 percent of Erlin Manor's income, and 90 percent of St. John's income.

The provider agreements in effect on the date of the filing of the Petition were entered into by Dartmouth in July 1981, by St. John's in August 1981, and by Erlin Manor in December 1981.

The provider agreement by its terms exists for a period not to exceed twelve months from the date of acceptance by Welfare. The agreement's terms also include the provider's promises to comply with all applicable state and federal regulations, to keep and disclose payment records, to accept the final rate, and to notify Welfare of a change in ownership and bankruptcy. Welfare agrees to pay the provider within a reasonable time, to give notice of a change of certification and accords the provider the right to appeal a payment determination. The Medicaid provider agreements incorporate Welfare's regulations (106 C.M.R. 456.000 *et seq.*) which establish the system for setting rates of reimbursement to the providers for servicing patients eligible for public assistance.

The Commonwealth has adopted a "retrospective payment system", administered by the Massachusetts Rate Setting Commission, which is incorporated into the provider agreement. Under this system, a provider receives payment on the basis of a provisional rate set prospectively. Subsequently, the payments may be adjusted based on actual costs. *Mass.Gen.Laws Chap. 6A Sections 31–36.*

The rates of reimbursement are set by the "Rate Setting Commission" (Commission) established pursuant to Mass.Gen. Laws Chap. 6A Section 32. The Commission is obligated to estimate a provider's interim rate for each fiscal year (July 1 to June 30) and within a reasonable time after the end of the year to set a final rate retrospectively for the calendar year. The interim rate is based on data from the

provider's prior year's operations and a cost adjustment factor as determined by the regulations. Welfare makes monthly payments to each provider for services rendered to each eligible patient after the end of the month in accordance with the interim rate.

The Commission establishes final rates for the year based on the actual costs incurred in providing health care services as verified by the provider's actual costs report, or a full field audit. The Commissioner is required to set the final rate within six months of the provider's submission of data. Depending on the amount of the final rate, the determination of the final rate will indicate either an overpayment or an underpayment to the provider. The regulations also permit the amendment of the Interim Rate, which similarly may result in a retrospective underpayment or overpayment.

If the final rate or corrected interim rate is greater than the interim rate, Welfare becomes liable to pay the underpayment forthwith. If the final rate is lower than the interim rate, the provider is obligated to pay Welfare the amount of overpayments received. At the discretion of Welfare a liability incurred by a provider as a result of an overpayment in a prior year may be recouped by deductions from current and retroactive payments due the provider. *See* 106 C.M.R. 456,.703.

The disputes in these three adversary proceedings resulted from Welfare's determinations in late 1981 that the providers had received overpayments for 1975, 1976, 1980, and underpayments for 1981. Welfare's deduction of the overpayments from current reimbursements precipitated the filing of the Chapter 11 cases.

On September 2, 1981, the Commission increased the Interim Rate for the months of July and August 1981, resulting in a credit owed to Erlin Manor of $38,909.00, a credit of $32,625.95 to St. John's and a credit of $18,967.80 to Dartmouth House.

On December 17, 1981, nearly five years after the 1976 contract term had ended,[1] the Rate Setting Commission established the 1976 final rate which resulted in a liability of each of these providers to Welfare. Welfare established that Erlin had received an overpayment of $211,756.44 for 1976, that Dartmouth House had received an overpayment of $84,480.00 for 1976, and that St. John's had received an overpayment of $104,960.56 for 1976. Also on December 17, 1981, the Commission determined that Dartmouth's 1975 final rate was less than the 1975 interim rate, causing a 1975 overpayment to Dartmouth of $58,734.09. Dartmouth's 1980 interim rate was also decreased, resulting in another overpayment of $18,743.67. Total overpayments prior to the filing of the Chapter 11 petition were $161,957.92 to Dartmouth, $104,960.56 to St. John's, and $211,756.44 to Erlin Manor.

The debtors filed appeals from the final rates, which are still pending. The regulations provide that the appeal does not stay the recoupment procedure, and Welfare treated the various overpayments as follows:

*Dartmouth House:* Twelve months before the filing of the Chapter 11, Welfare commenced a ten per cent (10%) reduction in Dartmouth's monthly medicaid disbursements for current services. From January to November 1981 Welfare deducted a total of $59,716.43 from Dartmouth's current reimbursements. After the filing of the Chapter 11, Welfare imposed a ten percent reduction in payments for December 1981 and January 1982, totalling $11,923.25 which Welfare admitted became due postpetition. In February 1982 Welfare credited against Dartmouth's indebtedness the amount of $18,967.80 by reason of its increase on September 3, 1981 for the July and August 1981 interim rate.

*Erlin Manor:* In February 1982, Welfare reduced Erlin Manor's January 1982 current payment by ten percent (10%) in the

---

1. The court cannot help but note that the Rate Setting Commission's apparent inability or indifference in timely setting its final rates, in contravention of its own regulations, contributed greatly, if not primarily, to this debtors' financial crises.

amount of $10,426.00. Also in February 1982, an interim rate increase for the months of July and August 1981 in the amount of $38,909.00 was credited against the 1976 overpayment.

*St. John's:* In February 1982 Welfare reduced St. John's January 1982 reimbursement by ten percent (10%) in the amount of $11,215.22 and applied the interim rate increase of $32,625.95 for July and August 1981 against the 1976 overpayment.

This case presents a question concerning the validity of Welfare's regulations which permit Welfare to reduce current post-filing payments owed the debtors, and to retain credits owed for pre-petition services, in satisfaction of the provider's liabilities for prior contract years. Welfare seeks approval of its equalization procedure to validate the offsets made to date, and so that it may resume the deductions which this Court enjoined in March 1982. The Commonwealth contends that its regulations, incorporated into the 1981 provider agreement, is a valid, executory contract, and that the debtor must assume the burdens of the recoupment provisions together with the contract's benefits. The Commonwealth asserts that the automatic stay of 11 U.S.C. Section 362 is not violated by its adjustments of the future payments and credits because the relationship of the parties is governed by a continuing executory contract.

The Court first will examine the propriety of post-petition deduction to satisfy Welfare's overpayments from prior contract years. The propriety of Welfare's setoff procedure depends upon whether the overpayments are entitled to special status because the debtor's agreement to satisfy the prior years overpayments is an executory obligation or whether the overpayments are antecedent unsecured liabilities of the provider.

For the following reasons it is my conclusion that the overpayments are antecedent unsecured liabilities, and that the obligation to pay overpayments from prior contract years is not an executory obligation of the debtor.

An executory contract has been defined as "a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other." *Countryman, Executory Contracts in Bankruptcy: Part 1, 57 Minn.L.Rev. 439, 460 (1973).* The legislative history to 11 U.S.C. Section 365 similarly describes an executory contract as one in which performance remains due to some extent on both sides." *H.R.Rep. No. 595, 95th Cong. 1st sess. (1977), reprinted in 1978 U.S. Code Congressional and Administrative News 5787, 5963, 6303–04.*

This court cannot agree with Welfare's Contention that the 1975, 1976 and 1980 were executory contracts as of the filing of the petition, or that the obligation to satisfy the prior years' overpayments was an executory obligation of the debtor on the date the petition was filed.

By their express language, the provider agreements exist only for a term not to exceed twelve months. The obligations of the provider and Welfare terminate upon expiration of the contract. There is no material performance due from Welfare at the expiration of the term. The sole remaining obligation of Welfare is to correlate the interim and the final rates, which is purely a ministerial and mathematical determination, which does not rise to the level of an executory obligation. The obligations of the provider are completed at the end of the contract term as well. The provider has rendered all services required of it under the contract. At the end of the twelve month contract term, the contracts are fully executed, not executory.

Accordingly, this court finds that the 1975, 1976 and 1980 contracts were not executory contracts as of the date these Chapter 11 petitions were filed.

Moreover, it is my view that the providers' promise to continue the obligation to satisfy the overpayments under the 1981 provider agreement, which both parties

agree was an executory contract on the date of the filing, does not change the nature of the 1975, 1976, and 1980 overpayments to an executory obligation. The parties' obligations for 1975, 1976 and 1980 had terminated when the contract terms had ended.

The overpayments must be considered antecedent unsecured debt. 11 U.S.C. Section 101(11) defines a "debt" as a "liability on a claim." A claim, as explained in 11 U.S.C. Section 101 (4) means "a right to payment, whether or not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, legal, equitable, secured, or unsecured."

In the present case, it is obvious that a prefiling debt existed because Welfare considered the providers liable for repayment prior to the filing of the petition because of overpayments for 1975, 1976 and 1980. The exact amount of the liabilities was determined on December 17, 1981. Moreover, the liabilities were all incurred in prior contract years. Each provider agreement for the years 1975, 1976 and 1980 (the years for which these providers received overpayments) expressly existed for a term of twelve months. All of the overpayments were made in pre-filing contract years, even though the amount of liability is not determined until later when Welfare makes ministerial mathematical calculation of the amount of overpayment. The liabilities which are the subject of this action arose from the Commission's determination in December 1981 that the 1975, 1976 and 1980 final rates were less than the interim rates. Thus, these debts were incurred each contract year, and the amount of liability was established in December 1981, which were both pre-filing events.

■ Claims for overpayments by state agencies have been determined subject to the operation of bankruptcy law. Overpayments by a governmental agency are considered general unsecured claims, subject to a discharge in bankruptcy, and are not accorded special status because they are debts owed to a governmental entity. *See, e.g. Neavear v. Schweiker,* 674 F.2d 1201, 9

B.C.D. 132 (7th Cir.1982) (social security overpayments); *In re Rowan,* 15 B.R. 834, 8 B.C.D. 549 (Bkrtcy.N.D.Ohio 1981).

In cases involving individual Chapter 7 debtors, recent decisions have prohibited the government from asserting the right to withhold future social security benefit payments in satisfaction of prior overpayments, rejecting arguments that the claim is secured and is not subject to the discharge. *See, e.g. In re Neavear,* 674 F.2d 1201, 9 B.D.C. 132 (7th Cir.1982); *In re Rowan,* 15 B.R. 834, 8 B.C.D. 549 (Bkrtcy.N.D.Ohio 1981); *In re Alice Mary Patterson,* 5 B.C.D. 777 (S.D.Tex.1976); *In re Howell,* 4 B.R. 102 (Bkrtcy.M.D.Tenn.1980). *See also, In re H.L. Hill,* 19 B.R. 375, 9 B.C.D. 53, 54 (Bkrtcy.D.Tex.1982).

■ Similarly, in the context of Chapter 11, an unsecured creditor may not require the payment of a pre-filing unsecured debt as a condition of providing services to the debtor in possession. For instance, the courts have consistently invalidated utility regulations requiring a debtor to pay its pre-filing bills as a condition of obtaining Chapter 11 utility service, because these rules prefer utility unsecured creditors over other unsecured creditors. *See, e.g. Matter of U.S. Financial, Inc.,* 594 F.2d 1275 (9th Cir.1979); *In re Kassuba,* 396 F.Supp. 324 (N.D.Ill.1975). Regulations requiring payment of pre-filing debts must be subordinated to the distribution scheme under the Bankruptcy Code. Id. 594 F.2d at 1279. If such rules were upheld, and creditors could continue to enforce their state law rights, the Bankruptcy laws would be meaningless. *In re Fontainbleau Hotel Corp.,* 508 F.2d 1056, 1059 (5th Cir.1975).

■ I see no reason to treat the Commonwealth differently from any other creditor who had the right to payment prior to Bankruptcy, which is now suspended pending resolution of the bankruptcy case. To permit the state to recover its pre-filing debts by reductions in current reimbursement grants it priority status over all other creditors in contravention of the distribution scheme of 11 U.S.C. Section 726. Ac-

cordingly, insofar as Welfare's regulation may be used to coerce these debtors into preferring Welfare over other creditors, it is inconsistent with the scheme of distribution under the Bankruptcy Code, and consequently must yield under the Supremacy Clause of the United States Constitution, Article VI Section 2. *Matter of U.S. Financial, Inc.,* 594 F.2d 1275, 1279 (9th Cir.1979); *Perez v. Campbell,* 402 U.S. 637, 648–49, 91 S.Ct. 1704, 1710–11, 29 L.Ed.2d 233 (1971); *In re Colonial Realty Investment Co.,* 516 F.2d 154 (1st Cir.1975).

The debtor's agreement to permit setoff does not validate the procedure, even though the executory contract is considered in effect until rejected. Numerous and various provisions and clauses which would be enforceable in non-bankruptcy law, are invalid in bankruptcy. *See, e.g.,* 11 U.S.C. Section 365(e)(1) (lease termination clauses); 11 U.S.C. Section 365(f)(1) (anti-assignment clauses); 11 U.S.C. Section 522(f)(2) (certain security interest which impair exemptions in consumer goods); 11 U.S.C. Section 724(a) and 726(a)(4) (penalty clauses); 11 U.S.C. Section 522(e) (waiver of exemptions); 11 U.S.C. Section 727(a)(9) (waiver of discharge). Whether mandated by regulation, or permitted by agreement, the sole purpose of the offset procedure is to prefer the state's unsecured claim over other creditors, which is an unlawful purpose under the bankruptcy laws.

The Commonwealth defends its right to offset pre-petition indebtedness from post-petition credits due the debtors by reason of the relationship of the parties which it analogizes to a "running account." The case of *Haverhill Manor v. Commissioner of Public Welfare,* 368 Mass. 15, 330 N.E.2d 180 (1975) described the provider/Welfare relationship as a "mutual and open account current" and determined that the offset procedure did not violate due process because the aggrieved party had access to the courts to contest the agency decision. *Id.* at 190–91.

The characterization by the Massachusetts Supreme Judicial Court as an "open account", and its ratification of the offset procedure are not determinative of the issue presented, because absent from *Haverhill Manor* was the element of bankruptcy intervention. Undoubtedly, the offset procedure is a properly exercised, state-created right available to Welfare prior to bankruptcy. The propriety of the procedure under state law, however, does not legitimize the collection of a pre-petition debt by a method improper in bankruptcy.

Welfare's state-created rights were suspended after the initiation of bankruptcy proceedings. To the extent the state procedure conflicts with the bankruptcy law, it is suspended. *In re Colonial Realty Investment Company,* 516 F.2d 154, 158 (1st Cir. 1975). Accordingly, this Court holds that to the extent Welfare's regulation permits the state to obtain payment of pre-petition unsecured indebtedness during the pendency of this Chapter 11 case, it is invalid and inoperative in the bankruptcy context.

Welfare claims as an additional ground in support of its equalization procedure that it has the right to setoff the amount of the overpayment against the post-petition reimbursement owed the debtor-in-possession pursuant to 11 U.S.C. Section 553.

Even assuming that the position of Welfare is meritorious, the state's unilateral adjustment of the debtor's right to reimbursement to satisfy pre-petition overpayments was a violation of the automatic stay of 11 U.S.C. Section 362, which stays enforcement of all debt collection against the debtor.

11 U.S.C. Section 362(a)(1), (6) and (7) provides in pertinent part:

> Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title operates as a stay, applicable to all entities of
>
> > (1) the commencement or continuation, including the issuance or employment of process, of a judicial, *administrative,* or other proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or *to recover a claim against the debtor that arose be-*

*fore the commencement of the case* under this title; ...

(6) any act to collect, assess, or to recover a claim against the debtor that arose before the commencement of the case under this title; ...

(7) the setoff of any debt owing to the debtor that arose before the commencement of the case under this Title against any claim against the debtor; (Emphasis added).

■ There is no evidence that Congress intended to exempt governmental entities from the automatic stay. *In re H.L. Hill,* 19 B.R. 375, 9 B.C.D. 53, 54 (Bkrtcy.D.Tex. 1982). In fact, Section 362 specifically proscribes the continuation of any administrative proceeding to recover a pre-petition claim. The automatic stay takes precedence over the internal regulations promulgated by a governmental agency. *In re H.L. Hill, supra,* 19 B.R. 375, 9 B.C.D. at 56. Accordingly, in the present case, Welfare should not have resorted to self-help, and should have sought relief from the stay before applying the January and February payments and the retropayments to its pre-petition claim.

■ Notwithstanding this Court's disapproval of such procedurally improper setoffs, I will proceed to consider the merits of Welfare's right to setoff the post-petition credits against the pre-petition debt, because holding the setoff invalid for a violation of the stay would be an overly strict penalty if Welfare's setoff was otherwise valid, and relief from the stay might be warranted if the setoff were proper. As justification for its use of post-petition credits to satisfy pre-petition debt, Welfare claims it has the right of setoff under Section 553, which provides:

(a) except as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case.

Section 553 permits setoff of mutual pre-petition obligation of debtor and creditor, and does not address the legality of setting off pre-petition debt against post-petition credit. *A. Ahart, Bank Setoff Under Bankruptcy Reform Act of 1978.,* 53 Amer.Bankr.L.J. 205, 215–16 (1978). It is well established that the requisite element of mutuality is lacking and the setoff is improper where a creditor applies a credit owed a Chapter 11 debtor to satisfy a pre-filing debtor because the debtor and the debtor-in-possession are separate and distinct entities. *In re H.L. Hill,* 19 B.R. 375, 9 B.C.D. 53, 56 (Bkrtcy.N. D.Tex.1982); *In re Jag,* 7 B.R. 624 (Bkrtcy. D.Ma.1980); *In re Princess Baking Corp.,* 5 B.R. 587 (Bkrtcy.S.D.Cal.1980); 4 Collier on Bankruptcy Section 553.10(1) (15th ed.1979). Thus in the present case, since Welfare's claims to the overpayments arose before the filing, and the debtor's claims to reimbursement for January and February arose after the filing, the setoff was improper.

■ Moreover, the amount of a valid setoff is limited to the funds owed by the creditor to the debtor on the date of the filing of the bankruptcy petition; a creditor is not entitled to apply amounts which may be available subsequently. *In re Howell,* 4 B.R. 102 (Bkrtcy.N.D.Tenn.1980). Therefore, the right of setoff may not be asserted against future unmatured payments due the debtor. *Id.* at 104.

In the present case the debtor's entitlement to reimbursement for services rendered for January and February 1982 did not arise until the end of each respective month. As of the date of the filing of the Chapter 11 petition, none of the debtors was entitled to its January or February payments, or any future monthly payments because services had not yet been provided for those months. Accordingly, these unmatured payments were improperly reduced to satisfy pre-petition indebtedness.

Welfare relies heavily on the decisions *In re Monsour Medical Center,* 8 B.R. 606, (Bkrtcy.D.Pa.1981), *aff'd,* 11 B.R. 1014 (W.D.Pa.1981) in support of its contentions that the setoff provisions do not prohibit

recoupment of the overpayments because the agreement was executory. In *Monsour,* the hospital debtor participated in a retrospective payment system which included adjustment provisions similar to that in the case at bar, which was in effect on the date of the filing. Of utmost importance is this difference between *Monsour* and this case. In *Monsour,* the court had approved the debtor's assumption of the medicare contract, and thus the recoupment provisions were executory. Because the debtor had agreed to the offset after bankruptcy, and the Court had approved assumption of the contract, the Court approved the equalization procedure. The automatic stay, in the Court's view, did not preclude the deductions because they were part of the assumed agreement. Moreover, the Court emphasized that before the Chapter 11, the debtor had not employed the administrative dispute procedure to contest the overpayments which further indicated the parties' understanding that the agency had the right to make deductions.

Despite the similarity of the facts in the *Monsour* case to those before me, I choose not to follow the *Monsour* decision for several reasons. The *Monsour* debtor's assumption of the contract is a critical distinction because it persuaded the *Monsour* courts to conclude that post-petition the debtor consented to the recoupment procedure. The element of consent is certainly lacking in the present case, as appeals of the final rates are pending, and the debtors have not yet decided to assume or reject the contracts. Although the issue is not before me, I would be inclined not to approve the assumption of these contracts, to the extent that the offset regulations incorporated therein prefer the state over other unsecured creditors by payment of pre-filing claims.

For this more fundamental reason, I am not inclined to follow *Monsour.* The Bankruptcy Court and the District Court ignored the question of the validity of a regulation requiring and a debtor's promise to satisfy pre-bankruptcy unsecured claims out of post-petition earnings for services rendered post-petition. As discussed previously in this opinion, this Court considers such a regulation and/or provision in an agreement null and void in the bankruptcy context.

For these reasons, Welfare's reductions in the January and February payments owed the debtors were unlawful, and any continued reductions to satisfy pre-petition indebtedness are permanently enjoined.

Notwithstanding this holding, it is my view that Welfare's setoffs of pre-petition credits owed the debtors for pre-petition services was properly applied to the overpayments before the Chapter 11 was filed.

■ Section 553 provides that the Code does not affect a creditor's right to offset a mutual pre-petition debt owed by the creditor against a pre-petition claim of the creditor. 11 U.S.C. Section 553. Debts must be mutual to effect a valid setoff, that is, they must be due between the same parties acting in the same capacity. *Ahart, Bankruptcy Setoff Under the Bankruptcy Reform Act of 1978,* 53 Amer.Bankr.L.J. 205, 216 (1979). Welfare met the requirements of a valid setoff under Section 553 when it applied the retropayments and the debtor's pre-petition monthly payments to the overpayment debt.

■ The debtors became entitled to the retropayments at the end of July and August 1981, after they had rendered the July and August services. Even if the debtors were not entitled to the retro payments until they were established, they were established on September 3, 1981 which was a pre-petition event. Accordingly, because the debts and credits existed prior to the petition, they could be the subject of valid setoff.

The second element of a valid setoff, mutuality is present because Welfare and the debtors owed each other by reason of their contractual relationship. Thus the application of $18,967.80 to Dartmouth's overpayment, $32,625.95 to St. John's overpayment, and $38,909.00 to Erlin Manor's overpayment must be considered a valid setoff under Section 553.

A similar result is reached with respect to the pre-petition adjustment of $59,716.43 imposed against Dartmouth House from January 1981 to November 1981, because the debts and credits arose mutually and prior to the filing of the Chapter 11.

Thus, prior to the filing of the petition Welfare was entitled to setoff the "retropayments" against the pre-petition debts owed by providers. Although these mutual obligations formed the basis of a proper setoff, it was improper for Welfare to appropriate the "retropayments" on February 5, 1982, after the filing of the petition, without permission of the Court because the exercise of the right of setoff is prohibited by the automatic stay. *In re Hill*, 19 B.R. 375, 9 B.C.D. 53, 54 (Bkrtcy.D.Tex.1982); *A. Ahart, Bank SetOff Under the Bankruptcy Reform Act of 1978*, 53 Amer.Bankr.L.J. 205, 212–213 (1979).

Moreover, because an application of the setoff provisions is permissive, rather than mandatory, the Bankruptcy Court has the discretion to invalidate the privilege of setoff where setoff would frustrate a Chapter 11 debtor's ability to reorganize. *Bohack v. Borden, Inc.*, 599 F.2d 1160 (2d Cir.1979); *In re Princess Baking Corp.*, 5 B.R. 587, 6 B.C.D. 842 (Bkrtcy.S.D.Cal.1980). In enacting Section 553 Congress recognized that:

"... Treatment of setoff in a reorganization case is very different than in a liquidation case. In order to accomplish a successful reorganization it is important that business proceed as usual for the debtor. Setoff is an interruption in the conduct of the business and may have detrimental effects on the attempted reorganization." House Report at 183.

In the present case, it is undisputed that Welfare's setoffs of the retropayments have impaired the debtors' cash flow as debtors have been unable to satisfy monthly mortgage debt. Moreover, the element of the public interest is present in this case because patients' health and lives may be jeopardized by precarious cash flow.

Accordingly, despite the substantive merits of Welfare's entitlement to setoff the retropayments, it is my opinion that the debtor's substantial need for the funds, coupled with the public interest factor, and in view of Welfare's blatant violation of the stay in setting off post-petition requires a ruling that setoff of the retropayments on February 5, 1982 was void and of no effect.

Moreover, the setoff deprived the debtors of property of the estate. 11 U.S.C. Section 541 includes in the definition of property of the estate any recovery by the trustee (in this case the debtor-in-possession) of a debt offset by a creditor. Moreover, the inclusion of an amount eligible for setoff in the definition of property of the estate comports with the Code's treatment under Section 506(c) which provides that the amount of funds a creditor is entitled to setoff is a statutory lien, tantamount to a perfected security interest. *See* 11 U.S.C. Section 506(c); *A. Ahart, Bankr. Setoff under the Bankruptcy Reform Act of 1978, supra*, 53 Amer.Bankr.L.J. at 210; *House Report* at 184–85.

This Court has the power to order turnover of property of the estate, even if the secured party was entitled to repossess if the property is necessary for rehabilitation of the debtor. *United States v. Whiting Pools, Inc.*, 674 F.2d 144, 8 B.C.D. 1138 (2d Cir.1982) (pre-filing levy by insurance invalidated; property ordered returned because prospects for rehabilitation depended on debtor's use of property).

The debtor's right to use funds eligible for setoff is not absolute, however. *See* 11 U.S.C. Section 363. Like any holder of a secured claim, the Bankruptcy Court, as a court of equity, must devise means to adequately protect an entity who has an interest in property, such as a party with a statutory lien. *See In re Beef n' Burgundy, Inc.*, 21 B.R. 69, 9 B.C.D. 324 (Bkrtcy.N.D. Ga.1982). An entity with a right to setoff is entitled to relief from the stay, unless its interest is adequately protected, as defined in Section 361. *Applied Logic Corp.*, 576 F.2d 952 (2d Cir.1978); *In re Princess Baking Corp.*, 5 B.R. 587 (Bkrtcy.S.D.Cal.1980). Unless the debtors sustain their burden of

demonstrating a method of adequate protection as required by 11 U.S.C. Section 362(g) insured to pay Welfare the amount eligible for setoff, Welfare would be entitled to relief from the stay, and would be permitted to retain the retropayments setoff post-filing.

This Court shall hold further hearings for the purpose of obtaining evidence on the question whether debtors are capable of offering adequate protection within the meaning of Section 361 of Welfare's setoff lien. If no alternative method is found adequate, the Court shall lift the stay *nunc pro tunc* and allow Welfare to retain the retropayments.

In summary, Welfare is entitled to retain the amount of $59,716.43 which represents the proper reductions in current disbursements due Dartmouth from January 1981 to November 1981. Welfare is required to refund Erlin Manor $10,426.00, St. John's $11,215.22, and Dartmouth House $11,923.25, which represent the amounts Welfare improperly setoff post-petition.

Finally, Welfare has an unsecured claim in the amount of $172,847.44 against Erlin Manor, $72,334.61 against St. John's, and $83,273.69 against Dartmouth House, which represent the amount of each debtor's overpayment less the amount Welfare properly setoff prior to the filing of the Chapter 11 petition.