In re WJM, INC.

In re ROCKVIEW, INC.

In re WALTER M., INC.

In re SENIOR CARE
ASSOCIATES, INC.

WJM, INC., Rockview, Inc., Walter M.,
Inc. and Senior Care Associates,
Inc., Plaintiffs,

v.

COMMONWEALTH OF MASSACHU-
SETTS, Through its DEPARTMENT
OF PUBLIC WELFARE, Defendant.

Bankruptcy Nos. 86–10266–JNG, 86–
10202–JNG, 86–10288–JNG,
86–10287–JNG and 86–10266–JNG.
Adv. No. 86–1043.
Bankruptcy Appeal No. 86–3180–MA.

United States District Court,
D. Massachusetts.

Dec. 30, 1986.

Despena F. Billings, Asst. Atty. Gen., Boston, Mass., for plaintiffs.

Paul P. Daley, Hale & Dorr, Stewart Grossman, Looney & Grossman, Lewis Sassoon, Gargill, Sassoon & Rudolph, Boston, Mass., for defendant.

## MEMORANDUM AND ORDER

MAZZONE, District Judge.

This matter is before the Court on appeal from an order of the Bankruptcy Court, 65 B.R. 531 entering judgment against the Department of Public Welfare (the "DPW") and ordering it to pay the appellee, Senior Care Associates, Inc. the sum of $13,094.14 and the appellee, WJM, Inc. the sum of $56,646.36. On November 7, 1986, this Court granted the appellant a stay of the Bankruptcy Court's order pending this appeal. The DPW subsequently filed a 59–page brief in support of its appeal, along with a 475–page appendix detailing

the prior proceedings in this matter. The appellees have filed opposition to this appeal. The background of this case is as follows.

## I.

The appellees are four Massachusetts corporations formed by Walter J. Mikolinski, Jr. ("Mikolinski") and/or Anthony Accaputo, Jr. ("Accaputo") to purchase and operate nursing homes. Rockview, Inc. was organized in or around April, 1979, to operate the Mary Murphy Nursing Home ("Mary Murphy") in Jamaica Plain; Walter M., Inc. ("WMI") was organized on or about July 1, 1980, to operate the Middlesex Manor Nursing Home ("Middlesex Manor") in Framingham; WJM, Inc. was organized about March 1, 1980 to operate the Winter Hill Nursing Home in Somerville; and Senior Care Associates, Inc. was organized on or about April 1, 1982 to operate the Plainville Nursing Home ("Plainville") in Plainville. Between 1982 and 1985, Rockview, WMI, WJM and Senior Care were owned jointly by Mikolinski and Accaputo as fifty percent shareholders. In September of 1985, Mikolinski and Accaputo instituted transactions making Accaputo the sole shareholder of Rockview and WMI, and Mikolinski the sole shareholder of WJM and Senior Care.

The real estate from which each of the four nursing home corporations conducts its business is owned separately by real estate trusts. Mikolinski is the trustee of each of the real estate trusts, and he and Accaputo each hold 50% of the beneficial interests in each of the trusts. The rent for each of the nursing homes was paid by Senior Care Management, Inc., a company owned by Accaputo and Mikolinski, until September of 1985 when Mikolinski relinquished his interest in that company. The management company acted as a "clearinghouse," maintaining separate accounts for each of the nursing homes and the related real estate trusts, receiving all funds due to each entity, and paying their liabilities by debiting and crediting each entity's separate account and paying third-party obligations.

The dispute in this case centers around Medicare/Medicaid reimbursements to the nursing homes. The nursing homes, as providers of health care services to eligible persons under programs administered by the DPW, each year sign provider agreements with the DPW. These provider agreements outline the relationship between the DPW and the nursing homes. The agreements call for the maintenance of certain records by the nursing homes concerning the extent of services and goods furnished to eligible recipients, and also contain promises by the provider to comply with all applicable state and federal regulations. The DPW, under these agreements, promises to reimburse the providers at rates set by the Massachusetts Rate Setting Commission (the "Commission"), and to afford the provider the right to appeal payment determinations and termination from the program.

Nursing homes receive Medicare/Medicaid reimbursement under the Commonwealth's retrospective payment system. Under this system, the DPW advances funds to the homes for current services based upon an interim (or estimated) rate set by the Commission. At the end of the year, each facility files a cost report, known as an RSC–1, which is ultimately used to establish the final payment rate for that year. The related real estate trusts and the management company also file annual cost reports known, respectively, as RSC–2's and RSC–3's. If the final rate set by the Commission is higher than the interim rate of reimbursement, the DPW owes the difference to the facility. If, however, the final rate is lower, the facility is liable to pay the DPW the difference, known as an overpayment.

Based on final rates through 1982 set by the Commission for Mary Murphy, and rates through 1981 set for Middlesex Manor, the DPW determined that both Rockview and WMI were indebted to it in substantial amounts.[1] The DPW made de-

---

1. According to the appellant's brief, "[a]t the time of the Bankruptcy Court proceedings in this case, the Commission had set final rates for Mary Murphy Nursing Home through 1982, and

mand upon Rockview and WMI for the amounts of the overpayment, and when no payments were forthcoming, the DPW elected to offset portions of these debts against payments to the Plainville and Winter Hill facilities. The DPW based this action upon 106 C.M.R. § 456.703(B) which provides:

> If two or more facilities are or were under a common ownership, and if one or more of the facilities is owed money by the Commonwealth, the Department may offset the provider's liability to the Department against the Department's liability to the provider.

The Department, through February 27, 1986 offset a total of $56,646.36 against payments to the Winter Hill Nursing Home, and through February 3, 1986 a total of $13,094.14 against payments to the Plainville Nursing Home.

On March 4, 1986 and March 7, 1986, within 90 days of the DPW's action, Winter Hill and Plainville, respectively, filed voluntary Chapter 11 petitions under 11 U.S.C. § 101 *et seq.*, and thus all four of the nursing homes involved in these proceedings have been operating since that time as debtors-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108, under Bankruptcy Court supervision.[2]

The nursing homes, on March 13, 1986, filed a complaint pursuant to which they sought, in their Count IV,[3] to void the DPW action as a "preferential transfer" under 11 U.S.C. § 547. The DPW filed a motion to dismiss that was denied after hearing by the Bankruptcy Court on May 5, 1986.

An evidentiary hearing was held on May 15, and 16, 1986. A joint stipulation of fact was submitted, along with the testimony of Joseph J. Patts, an accountant and real estate broker, David Hines, supervisor of audits at the Massachusetts Rate Setting Commission, and Walter J. Mikolinski. At this hearing, the parties agreed that the issue before the court was whether the DPW's actions constituted "an appropriate set-off" or an "avoidable preference." Transcript of May 15, 1986 Evidentiary Hearing, p. 3 (Appendix, p. 256).

The Bankruptcy Court filed its Memorandum and Order on September 16, 1986, declaring that the DPW's actions constituted voidable preferential transfers of Winter Hill's and Plainville's property within 90 days of the filing of their Chapter 11 petitions, and ordering the monetary judgment in favor of Senior Care and WJM. It is from that order that the DPW appeals.

Under Bankruptcy Rule 8013, this Court is bound to accept the Bankruptcy Court's factual findings unless "clearly erroneous," with "due regard" given to the bankruptcy judge's opportunity to assess the credibility of the witnesses who appeared before him. But, of course, this Court must independently determine the correctness of the law upon which the Bankruptcy Court relied in making its factual findings. *In re Mazzola*, 23 B.R. 263, 265 (D.Mass.1981).

In its appeal to overturn the Bankruptcy Court's order, the appellant advances two main arguments:

(i) the Bankruptcy Court erred as a matter of law in that the DPW's offsets were not voidable preferential transfers under 11 U.S.C. § 547;

---

for Middlesex Manor Nursing Home through 1981. The facilities have appealed those rates administratively to the Massachusetts Division of Administrative Law Appeals. At the rates set, those two nursing homes had an undisputed joint Medicaid indebtedness to the Commonwealth of $451,012.05. Neither has repaid their debt despite demand and, as both facilities are in bankruptcy, the Department is unable to recoup that debt because of the automatic stay provision of 11 U.S.C. § 362." Appellant's Brief, p. 7.

The appellee's brief indicates that Mary Murphy filed its Chapter 11 petition on October 25,

1985, and Middlesex Manor filed its Chapter 11 petition on March 7, 1986. Appellee's Brief, p. 8, footnote 3.

**2.** As indicated in footnote 1, *supra*, Mary Murphy and Middlesex Manor also filed Chapter 11 petitions. Pursuant to a March 21, 1986 motion of the nursing homes, the four Chapter 11 cases have been consolidated for procedural purposes only.

**3.** The complaint consisted of four counts; the nursing homes withdrew Counts I–III on May 5, 1986.

(ii) the Bankruptcy Court lacked jurisdiction over the plaintiff's claims.

I will address these arguments in order.

## II.

■ The arguing that the Bankruptcy Court erred as a matter of law in determining that the DPW's offsets were voidable preferential transfers, the appellant's first claim is that the DPW's procedure did not constitute a "transfer" for purposes of 11 U.S.C. § 547. Under the Bankruptcy Code, 11 U.S.C. § 101(48), a "transfer" is defined as

every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title as a security interest and foreclosure of the debtor's equity of redemption.

The DPW argues here, as it did below, that its decision to offset does not result in the disposition of, or parting with, any property or interest of the nursing home. The offset procedure, instead, "merely advises the nursing home that the Department will withhold a percentage of current payments in order to satisfy a claim." Appellant's Brief, p. 31. Under state law enunciated in *Haverhill Manor, Inc. v. Commissioner of Public Welfare*, 368 Mass. 15, 330 N.E.2d 180 *cert. denied*, 423 U.S. 929, 96 S.Ct. 277, 46 L.Ed.2d 257 (1975), the appellant asserts, the nursing homes have no right to payment beyond the balance in their accounts.

The Bankruptcy Court rejected this argument below, relying on *In re Dartmouth House Nursing Home*, C.A. No. 84–667–Z, slip op. (D.Mass. September 25, 1985), *aff'g* 24 B.R. 256 (Bankr.D.Mass.1982). I believe the court was correct. In *Dartmouth House*, the District Court, as did the Bankruptcy Court, specifically rejected the application of the *Haverhill Manor* holding to bankruptcy proceedings. Under the circumstances present in this case, the Bankruptcy Court correctly found that *Haverhill Manor* is not determinative of the issue presented, that the nursing homes have property interests in funds owed by the

DPW, and that "transfers" occurred for purposes of 11 U.S.C. § 547.

■ I also cannot find any merit in the appellant's contention that, even if the offsets are found to be preferential transfers, they are not subject to avoidance because they fall within "the ordinary course of business" exception established by 11 U.S.C. § 547(c)(2). That section provides:

(c) The trustee may not avoid under this section a transfer—

(2) to the extent that such transfer was—

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms.

The Bankruptcy Court properly found below that the offsets made by the DPW were not made because of debts incurred by Plainville and Winter Hill. The debts were incurred by Rockview and WMI, and a careful review of the record supports the Bankruptcy Court's finding that there was no evidence indicating that Plainville and Winter Hill, in the ordinary course of their businesses, paid the debts of WMI and Rockview. The offsets may, as the DPW argues, be an "ordinary, even inevitable, byproduct of the retrospective payment system," and they may have been "in no sense abnormal" under state regulations and DPW procedure, but this is not equivalent to the transfers being made in the "ordinary course of business" as defined by 11 U.S.C. § 547(c)(2).

■ The appellant next argues that the Bankruptcy Court erred as a matter of law in its finding that the transfers were voidable preferences because, in fact, the transfers were actually "setoffs" governed by 11 U.S.C. § 553. This section provides that the Bankruptcy Code "does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the

case...." The DPW cites *Dartmouth House*, 24 B.R. at 264, for the proposition that the DPW was entitled to offset prepetition claims against prepetition debts.

*Dartmouth House*, though, involved offsets by the DPW from a debtor in satisfaction of *that* debtor's liability for overpayments. The Bankruptcy Court correctly distinguished *Dartmouth House* with respect to Section 553's applicability to this case, in that the DPW here seized the debtor's funds because of debts of wholly different providers. As with the "ordinary course of business" exception, the lack of mutuality between the parties from which the DPW seized funds, and the parties owing money to the DPW, is dispositive of this issue.

Finally, the appellant claims that preferential transfers could not have occurred because the plaintiffs were not insolvent when they filed their Chapter 11 petitions. The appellant argues that "the value of the real estate upon which the Winter Hill and Plainville Nursing Homes operate (held in trust by Mikolinski as trustee for the benefit of himself and Accaputo) should have been included in the plaintiffs' estates, since the law applied to those facts required a piercing of the plaintiffs' corporate veils." Appellant's Brief, p. 41. Furthermore, the appellant claims, the Bankruptcy Court improperly shifted to the DPW the burden of proof on the plaintiffs' financial condition, and that the plaintiffs did not meet their burden of proving insolvency. Once again, I fail to find any merit in the appellant's contentions.

■ THe Bankruptcy Court did not improperly place the burden of proof regarding the debtors' solvency or insolvency on the DPW. The court below specifically found that "the Debtors submitted sufficient evidence of the Debtors' insolvency," Memorandum and Order of September 16, 1986, p. 17, and this finding is supported by the record, notably by the testimony of Mr. Patts. The Bankruptcy Court properly considered the testimony of Mr. Patts who, based on his personal knowledge of the nursing homes' financial condition gained while preparing the nursing homes' Sched-

ules of Assets and Liabilities and Statements of Affairs, and as keeper of their records, stated that at the time the nursing homes' Chapter 11 petitions were filed and in the 90–day periods preceding the filings, the debtors' liabilities exceeded their assets.

■ The Bankruptcy Court also dealt at length with the "corporate veil" issue in its opinion, and I see no reason to disturb its findings or conclusions in this area. The appellant argues that the real estate acquired by the related trusts should have been included as assets of the estates of Senior Care Associates, Inc. and WJM, Inc., under the criteria set forth in *My Bread Baking Company v. Cumberland Farms*, 353 Mass. 614, 233 N.E.2d 748 (1968). The standards enunciated in *My Bread*, however, require the party seeking to pierce a corporate veil to prove "some fraudulent or injurious consequences of the intercorporate relationship" or a "confused intermingling of activity" or "serious ambiguity" in the actions of the corporate entities. *Id.* at 619, 233 N.E.2d 748. The Bankruptcy Court, after evaluating the evidence, found that the DPW did not meet the standards for piercing a corporate veil in that it "failed to demonstrate any fraudulent or injurious consequences to it or any element of injustice or fraudulent unfairness with respcet to it." Memorandum and Order of September 16, 1986, p. 20.

The record in this case indicates that separate books and records were maintained by the entities, that there was no intermingling of funds or assets, that the real estate assets had been purchased, financed and held separate from the operating nursing homes, and that sufficient disclosure of the separate ownership and income of the entities, and the relationship of the nursing homes, the trusts, Senior Care Management, Accaputo and Mikolinski to one another was made to the Department on the RSC–2's and RSC–3's filed in the years prior to the filing of the petitions.

## IV.

I turn, then, to the appellant's second major argument for overturning the Bank-

ruptcy Court's order: that the Bankruptcy Court lacked jurisdiction over the plaintiffs' claims. The appellant argues that the Bankruptcy Court was without jurisdiction to interfere with the regulatory actions of a state agency, that the plaintiffs' claims were barred by the doctrine of sovereign immunity and the Eleventh Amendment, and the plaintiffs failed to exhaust the state administrative and judicial remedies available to them. This Court, however, finds that the Bankruptcy Court properly exercised jurisdiction over the claims involved in this case.

 Section 106 of the Bankruptcy Code contains a specific statutory waiver of sovereign immunity applicable to this case. This section provides that

> A governmental unit is deemed to have waived sovereign immunity with respect to any claim against such governmental unit that is property of the estate and that arose out of the same transaction or occurrence out of which such governmental unit's claim arose.

Having filed proofs of claim in each of the nursing home's Chapter 11 proceedings, the Commonwealth waived its right to claim sovereign immunity before the Bankruptcy Court. Similarly, the DPW's argument that the Bankruptcy Court lacked jurisdiction to "set aside or otherwise interfere with the regulatory laws of the state" is without merit. *See In re Erlin Manor Nursing Home, Inc.*, C.A. No. 84–764–Z, slip op. at p. 10 (D.Mass. September 25, 1985). Finally, I cannot accept the DPW's assertion that the Bankruptcy Court lacked jurisdiction because there are appeals of final rates pending before the Massachusetts Division of Administrative Law Appeals. The issue in this case did not concern the propriety of the final rates, but whether the actions of the DPW constituted voidable preferential transfers. The exhaustion doctrine therefore is not applicable to these proceedings.

### Conclusion

Thus, I find, after a thorough review of the Bankruptcy Court proceedings and the submissions of counsel to this Court, that the Bankruptcy Court properly exercised its jurisdiction in this case, that its findings were amply supported by the record, and that it correctly applied the applicable law to its findings. I hereby affirm, with interest, the order of the Bankruptcy Court ordering the DPW to turnover to Senior Care Associates, Inc., the sum of $13,-094.14 and to WJM, Inc., the sum of $56,-646.36. The request by counsel to Rockview, Inc., Walter M., Inc., and Senior Care Associates, Inc. for costs of defending this appeal is denied.

SO ORDERED.