In re WJM, INC., Rockview, Inc., Walter M., Inc., Senior Care Associates, Inc., Debtors.

WJM, INC., Rockview, Inc., Walter M., Inc., Senior Care Associates, Inc., Plaintiffs,

v.

COMMONWEALTH OF MASSACHUSETTS, Through its DEPARTMENT OF PUBLIC WELFARE, Defendants.

Bankruptcy Nos. 86–10266–JNG, 85–01202–JNG, 86–10288–JNG and 86–10287–JNG.

Adv. No. 86–1043–JNG.

United States Bankruptcy Court, D. Massachusetts.

Sept. 16, 1986.

Paul P. Daley, Hale & Dorr, Boston, Mass., for debtors/plaintiffs.

Despena F. Billings, Asst. Atty. Gen., Com. of Mass., Boston, Mass., for defendants.

## MEMORANDUM

JAMES N. GABRIEL, Bankruptcy Judge.

The matter before the Court is Count IV of the adversary complaint commenced on March 13, 1986 by WJM, Inc. ("WJM"), Rockview, Inc. ("Rockview"), Walter M., Inc. ("WMI") and Senior Care Associates, Inc. ("Senior Care") (collectively the "Plaintiffs") against the Commonwealth of Massachusetts, through its Department of Public Welfare (the "Department"). Through Count IV, WJM and Senior Care (collectively the "Debtors") seek the turnover of alleged preferential transfer payments to the Department. At a hearing on May 5, 1986, counsel for the Plaintiffs withdrew Counts I–III, the only other counts in the complaint. At that time, the Court also denied a Motion to Dismiss filed by the Department. A trial was held on Count IV on May 15 and May 16, 1986.

The dispute in Count IV of this adversary proceeding results from deductions made by the Department from current, prepetition reimbursements to WJM and Senior Care to satisfy overpayments made by the Department to Rockview and WMI. The Debtors allege the setoffs are voidable preferences pursuant to 11 U.S.C. § 547 (b)[1] pure and simple. The Department

---

1. Section 547(b) provides:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

counters with four alternative defenses: 1) that the deductions or setoffs were proper pursuant to 11 U.S.C. § 553; 2) that no transfers of interests of the Debtors in property resulted from the Department's offset procedure; 3) that the Debtors were not insolvent when the transfers occurred; and 4) that the offsets were made in the ordinary course pursuant to 11 U.S.C. § 547(c)(2). The Court will address each of the Department's arguments following a review of the facts.

## BACKGROUND

The Plaintiffs are four corporations formed by Walter J. Mikolinski, Jr. ("Mikolinski") and/or Anthony Accaputo, Jr. ("Accaputo") to purchase and operate nursing homes. Rockview was organized in or around April, 1979 to operate the Mary Murphy Nursing Home ("Mary Murphy") in Jamaica Plain; WMI was organized on or about July 1, 1980 to operate the Middlesex Manor Nursing Home ("Middlesex Manor") in Framingham; WJM was organized on or about March 1, 1980 to operate the Winter Hill Nursing Home ("Winter Hill") in Somerville; and Senior Care was organized on or about April 1, 1982 to operate the Plainville Nursing Home ("Plainville") in Plainville. Between 1982 and 1985, Mikolinski and Accaputo owned Rockview, WMI, WJM and Senior Care jointly as fifty percent shareholders.[2] In September of 1985, Mikolinski sold his shares of stock in Rockview and WMI back to those two corporations for nominal consideration with the result that Accaputo

became a 100% shareholder of both corporations. Likewise, Accaputo sold his shares of stock in WJM and Senior Care back to them for $1 with the result that Mikolinski became their sole shareholder.

The Plaintiffs furnish health care services to eligible persons under programs administered by the Department, particularly the Commonwealth's Medical Assistance Program. Cf. 42 U.S.C. § 1396 et seq. and M.G.L. c. 118E, § 1 et seq. Indeed, the four nursing homes serve almost exclusively indigent Medicare and Medicaid patients. Thus, Medicare/Medicaid reimbursements from the Department provide virtually the sole source of income for the four nursing homes.

Each year the four nursing homes sign provider agreements which govern their relationships with the Department. The provider agreements include inter alia the provider's promises to comply with all applicable state and federal regulations, cf. M.G.L. c. 118E, § 18(4), and to keep and maintain records sufficient to disclose fully to the Department the nature and extent of services and goods furnished to eligible recipients. They also include the Department's promises to reimburse the providers at rates set by the Massachusetts Rate Setting Commission and to afford the providers the right to appeal payment determinations and termination from the program. The provider agreements incorporate Department regulations, cf. 106 C.M.R. § 456.000 et seq., which establish the system for setting rates of reimbursement to

---

(1) to or for the benefit of a creditor;
(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
(3) made while the debtor was insolvent;
(4) made—
(A) on or within 90 days before the date of the filing of the petition; or
(B) between ninety days and one year before the date of the filing of the filing of the petition, if such creditor at the time of such transfer was an insider;
(5) that enables such creditor to receive more than such creditor would receive if—
(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and
(C) such creditor received payment of such debt to the extent provided by the provisions of this title.
11 U.S.C. § 547(b).

2. When Rockview was organized Pamela Accaputo, Anthony Accaputo's wife, and Mikolinski each owned 50% of its stock. Pamela Accaputo conveyed her interest in Rockview to her husband in 1982. When WMI was organized, Mikolinski owned 100% of its stock. In 1982, Accaputo purchased 50% of WMI's stock from Mikolinski.

providers furnishing services to patients eligible for public assistance.

The Commonwealth has adopted a retrospective payment system. Under that system, the rates of reimbursement are set by the Massachusetts Rate Setting Commission (the "Commission"), an agency established pursuant to M.G.L. c. 6A, § 32. The Commission sets per diem rates of reimbursement based upon the reasonable costs incurred by nursing home facilities during the rate year. Since the rates cannot be computed until actual cost data becomes available, each nursing home facility is given an interim per diem rate based upon the costs incurred in prior years adjusted for inflation. Nursing homes receive current payments on the basis of the interim rates. Because interim rates are estimated, adjustments for either underpayments or overpayments are inevitable when the final rates are set.

Regulations require that nursing homes submit annual cost reports known as RSC-1's. In them, each facility's expenses, income, and net worth are detailed and its ownership is disclosed, as well as that of other facilities in which the owner or owners have a direct or indirect ownership interest of 5% or more. These reports serve both as a statement of financial condition and a claim for reimbursement for expenses incurred in the care of publicly assisted patients. Additional reports known as RSC-2's and RSC-3's are required if a facility incurs rental expenses or management company or central office expenses. The RSC reports enable the Commission to establish final rates.

If the final rate is greater than the interim rate, the Department becomes liable to pay the underpayment. Conversely, if the final rate is lower that the interim rate, the provider is obligated to pay the Department the amount of overpayments received. In its discretion and pursuant to its regulations, the Department may deduct claims it has against a nursing home for overpayments from current and retroactive payments to that home or any other home related to that home by common ownership. *See* 106 C.M.R. § 456.703.[3]

According to the Plaintiffs' complaint, prior to June 1985 the Commission had established final rates for Middlesex Manor for 1980 and 1981, the two years in which the nursing home had been owned by WMI, and for Mary Murphy for the three years in which that nursing home had been operated by Rockview, i.e., 1979, 1980 and 1981. The Plaintiffs indicate that the Commission, on or about June 26, 1985, notified WMI and Rockview of proposed final rates for 1982 that were on a cumulative annual basis lower than the interim 1982 rates had been. Accordingly, WMI and Rockview, once the proposed rates had been certified as final by the Commission, filed appeals of the 1982 final rates to the Division of Administrative Law Appeals.[4]

When the final rates were set, the Department determined that both Rockview and WMI were indebted to it in substantial amounts. It, therefore, made demand upon them for the amounts of overpayments. Since no payments were forthcoming, the Department elected to offset portions of their debts against payments to related facilities, i.e., Plainville and Winter Hill. The following charts sets forth the relevant data:

---

**3.** Regulation 106 C.M.R. § 456.703(E) provides: If two or more facilities are, or were, under a common ownership, and if one or more of the facilities is owed money by the Commonwealth, the Department may offset the provider's liability to the Department against the Department's liability to the provider.

**4.** There was no direct testimony as to when the 1982 final rates were set by the Commission. In its pre-trial memorandum, the Department asserts final rates were set for Mary Murphy for the years 1979 through 1982 on or about August 1, 1985 and that final rates were set for Middlesex Manor for the years 1980 and 1981 in January of 1986. The discrepancy between the dates suggested by the Plaintiffs and those suggested by the Department is immaterial for present purposes.

| Approximate Date | Amount of Setoff | Debtor |
|---|---|---|
| 12/31/85 | $ 7,708.00 | Senior Care |
| 1/5/86 | 12,391.65 | WJM |
| 2/3/86 | 11,027.25 | WJM |
| 2/3/86 | 5,386.14 | Senior Care |
| 2/27/86 | 33,227.46 | WJM |

Within 90 days of these offsets, WJM and Senior Care filed for protection under Chapter 11 of the Bankruptcy Code, on March 4, 1986 and March 7, 1986, respectively. This adversary complaint was commenced shortly thereafter.

At the trial, the Debtors introduced the testimony of their accountant with respect to the elements of a preference. The Department introduced evidence relative to its insolvency defense, but relied upon the affidavits of Norman Flora[5] for all but its section 553 defense. The Department relied upon the legal arguments presented in its pre-trial memorandum for that defense.

The Department argues that if the corporate veils of the Debtors are pierced so as to include certain real estate held in trusts, the Debtors' liabilities do not exceed their assets. In support of its theory, the Department introduced the testimony of Mikolinski and others to illuminate the relationships involving the Debtors, their owners and the trusts.

Both Senior Care and WJM lease property from trusts and, at least until September of 1985, Senior Care Management, Inc. ("Management") managed all four Plaintiffs in this proceeding. Accordingly, The Debtors are required to submit RSC–2 and RSC–3 reports in addition to RSC–1 reports. WJM leases property from the WJM Trust. Mikolinski is the trustee of that trust, and he and Accaputo are each 50% beneficiaries. The trust has the same business and mailing address as WJM. Its only holding is the real estate leased to WJM. Likewise, Senior Care leases property from the AA Trust. Mikolinski is also trustee of the AA Trust, and he and Accaputo are 50% beneficiaries. The AA Trust

has the same business address as Senior Care, and its only holding is the real estate it leases to Senior Care. Prior to March 1, 1986, when WJM and the WJM Trust executed a written lease agreement, neither WJM nor Senior Care had written leases with their landlords, the trusts. Indeed, Mikolinski and Accaputo together with their attorney, negotiated the leases on behalf of the trusts as landlords and on behalf of the Debtors as tenants. Pursuant to these leases, called net-net-net leases by the Debtors, the Debtors paid all fixed costs of the trusts, including mortgage payments, insurance premiums, property taxes, plus the expenses of upkeep and improvements. Rent was paid on behalf of WJM and Senior Care by Management, a company owned equally by Accaputo and Mikolinski, until September of 1985 when Mikolinski relinquished his interest in that company. Management, acting as a "clearinghouse" and aiming to achieve economies of scale which would allow efficient purchasing, maintained separate accounts for the Plaintiffs and the trusts. Management received all funds due to each entity and paid their liabilities by debiting and crediting each entity's separate accounts and paying third party obligations.

The City of Somerville's current property valuation for the real estate owned by the WJM Trust and used by WJM as the Winter Hill Nursing Home is $930,000. That real estate is subject to two mortgages. The first mortgage is held by the Boston Five Cent Savings Bank, and the second mortgage is held by the Bromfield Trust. Roger Davis is the trustee of that trust. The Town of Plainville's current property valuation for the real estate owned by the AA Trust and used by Senior Care as the Plainville Nursing Home is $534,300. That real estate is subject to one mortgage, which is held by the Danielson Federal Savings Bank. A previous second mortgage held on that property by Anthony

---

**5.** The parties are in disagreement as to whether or not these affidavits were admitted into evidence. The trial transcript is not dispositive of the issue. In view of the Court's decision, consideration of the affidavits is not prejudicial to the Debtors.

Perullo ("Perullo") was discharged by Perullo for no consideration.

The method of paying the mortgages on the real estate owned by the WJM Trust was as follows: prior to September of 1985, Management made the monthly mortgage payments to the Boston Five Cent Savings Bank and to Roger Davis directly from the account of WJM. From September of 1985 until February of 1986, WJM made mortgage payments directly to the bank and to Roger Davis. From February of 1986 until the time of trial, the WJM Trust for the first time paid the bank and Roger Davis on the mortgages directly. The method of paying the mortgage on the real estate owned by the AA Trust was as follows: prior to February of 1986, Management made the monthly mortgage payments to the Danielson Federal Savings Bank directly from the account of Senior Care. From February of 1986 until the time of trial, the AA Trust for the first time paid the bank on the mortgage directly. On a continuous and regular basis, the banks holding mortgages on the real estate owned by both trusts addressed and sent the monthly or other statements for those mortgages directly to the nursing homes, rather than to the WJM and AA Trusts.

Mikolinski and Accaputo made an initial joint capital contribution to WJM of between $35,000.00 and $50,000.00. That cash "contribution" was, however, only a loan. Mikolinski could not recollect whether any initial capital contribution was made to Senior Care. Subsequently, no regular contributions were ever made to either Debtor. When sporadic contributions were made by Mikolinski or Accaputo, those contributions were only made as loans. Furthermore, no dividends were ever paid to Mikolinski or Accaputo on their stock, and they have never received annual dividend statements from the Debtors. There were no regular corporate meetings of the officers and directors of WJM or Senior Care from the dates of their incorporation until the time of trial.

The 1983 and 1984 RSC–2 reports submitted to the Commission by the WJM Trust and the AA Trust contain notable expenditures such as lease payments for Mercedes automobiles and payments to a company known as "Willclean," owned by Perullo. For the year 1983, the amounts paid to Willclean by all four Debtors totalled approximately $559,000. For the year 1984, the amount paid to Willclean by all four debtors in these proceedings totalled approximately $579,000.

Both Mikolinski and Accaputo took large salaries on a regular basis from the Debtors. For example, for the year 1983, Mikolinski took a salary from the four Debtors in the amount of $85,940 for 10,220 hours of work. For the year 1984, Mikolinski took a salary from the four Debtors in the amount of $87,360 for 10,296 hours of work. For the year 1983, Accaputo took a salary from the four Debtors in the amount of $94,796 for 9,098 hours of work. For the year 1984, Accaputo took a salary from the four debtors in the amount of $100,723.90 for 9,495 hours of work. Additionally Mikolinski received a salary of $99,000 from Management. For all the above time periods, however, WJM and Senior Care employed Robert Brennan as their full-time administrator.

## DISCUSSION

### I

 The Department argues that its prepetition setoffs (the amounts withheld from Senior Care and WJM between December 31, 1985 and February 27, 1986) are governed by section 553 and not subject to 11 U.S.C. § 547, relying on this Courts decision in *In re Dartmouth House Nursing Home, Inc.*, 24 B.R. 256 (Bankr.D.Mass. 1982), *aff'd*, 84–667–Z, slip op. (D.Mass. Sept. 25, 1985). The Department has the burden of showing that its actions come within the confines of section 553. *In re Balducci Oil*, 33 B.R. 847, 850 (Bankr.D. Colo 1983); *See also In re Wilson*, 29 B.R. 54 (Bankr.D.Ark.1982); *In re Carpenter*, 14 B.R. 405 (Bankr.D.Tenn.1981). In the *Dartmouth House* case, the Department offset

pre-petition and post-petition payments to the nursing homes. It then sought a declaration: 1) that it could continue to recoup claims arising out of a pre-petition rate year by offset against current payments; and 2) that it could exercise its rights to offset pre-petition claims against pre-petition debts, notwithstanding the automatic stay imposed by 11 U.S.C. § 362.

In *Dartmouth House*, the Department portrayed its relationships with the nursing homes as governed by continuing executory contracts. It defended its right to offset pre-petition indebtedness from post-petition credits due the nursing homes by asserting the existence of a "running account" or a "mutual and open account current". Cf. *Haverhill Manor, Inc. v. Commissioner of Public Welfare*, 368 Mass. 15, 330 N.E.2d 180 (1975). The Court disagreed with the Department's view. It found that the Department's relationship with the homes consisted of a series of annual contracts and that overpayments were antecedent unsecured liabilities not entitled to priority status by virtue of the Department's regulations, permitting the reduction of current payments and the retention of credits in satisfaction of liabilities for prior contract years, or section 553, at least with respect to post-petition setoffs. The Court concluded that "[t]o the extent the state procedure conflicts with the bankruptcy law, it is suspended," 24 B.R. at 262, and "that the requisite element of mutuality is lacking and setoff is improper where a creditor applies a credit owed a Chapter 11 debtor to satisfy a prefiling debtor [sic] because the debtor and the debtor in possession are separate and distinct entities." *Id.* at 263.

With respect to debts and credits existing prior to the petition, however, the Court reached a different conclusion. It determined that the Department's setoffs of pre-petition credits owed the debtors for pre-petition services were properly applied to overpayments prior to the filings. The Court stated: "section 553 provides that the Code does not affect a creditor's right to offset a mutual pre-petition claim of the creditor. 11 U.S.C. § 553. Debts must be mutual to effect a valid setoff, that is they must be due between *the same parties* acting in the same capacity." *Id.* at 264 (emphasis supplied). The Department maintains that this holding is dispositive of the issue now before the Court because if section 553 applies section 547 does not apply. *In re Balducci Oil Company, Inc.*, 33 B.R. at 851–52.

Unlike the situation in the *Dartmouth House* case, in which the Department reduced its disbursements for current services and retained interim rate increases for a debtor in satisfaction of that debtor's liability for overpayments, the Department, in the instant case, seized the Debtors' funds because of debts of wholly different providers. As a consequence, the Court finds there is no mutuality. The Department has cited no case other than *Dartmouth House* to support its position that its setoffs were proper and that case is factually distinguishable. Clearly, the Department's regulation permitting it to seek redress against a home under common ownership with the home against which it has a claim does not establish the requisite mutuality for purposes of section 553. As in *Dartmouth House*, the Court finds that bankruptcy law takes precedence over a conflicting state procedure. Therefore, the Department, having failed to meet its burden of proof with respect to mutuality, is not relieved of its obligation to turnover funds seized on the basis of section 553.

Alternatively, the Department has failed to meet its burden of proof with respect to the "insufficiency test," the purpose of which is to recover, as preferences, setoffs which occur within 90 days of the date of filing and which improve the creditor's position vis-a-vis other creditors. *In re Balducci Oil Co.*, 33 B.R. at 851. Insufficiency is defined as the "amount, if any, by which a claim against the debtor exceeds a mutual debt owing to the debtor by the holder of such claim." 11 U.S.C. § 553(b)(2). The insufficiency test

"requires determination of the creditor's 'insufficiency' at two points in time: 1)

the later of 90 days before petition or the first date during that 90 days on which there is an insufficiency; and 2) the date of setoff, whether on the date of petition or within the 90 days immediately preceding. To the extent that the insufficiency at setoff is less than it was at the earlier date, a setoff will be invalid."

*In re Balducci Oil Co.*, 33 B.R. at 851. The Department, instead of introducing evidence relative to the insufficiency amounts identified above, dismissed the insufficiency test limitation on its right of setoff by stating the following in a footnote:

This qualification is inapplicable, first, because the Department offset only a small proportion of the payments made to the plaintiffs during the 90 days preceding the petitions; second, because it is doubtful that there was an 'insufficiency' during that 90 day period ... and third, because it is doubtful that the Department would have improved its position within the meaning of § 553(b)(1) even it if had offset the entire debt to the plaintiffs within the 90 day period.

The Court is unpersuaded by these remarks.

## II

■ The Department argues that an offset or recoupment does not fall within the definition of transfer. The Bankruptcy Code defines a transfer as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title as a security interest and foreclosure of the debtor's equity of redemption...." 11 U.S.C. § 101(48).

According to the Department, a decision to offset by the Department does not result in a disposition of or parting with any property or interest of the nursing homes since the nursing homes merely have a claim under their contracts to payment that is neither disposed of or relinquished by the Department's decision to withhold a percentage of current payments. Additionally, the Department argues that, as a mat-

ter of state law, the nursing homes have no right to payment beyond the balance in their accounts. The Department, relying on the *Haverhill Manor* decision, suggests that the nursing homes are owed "only the balance in the account at the particular time, and charges by each may satisfy charges by the other. The balance owed by either is computed by setting off charges against favorable items." *Haverhill Manor, Inc.*, 368 Mass. at 22, 330 N.E.2d 180.

In the *Dartmouth House*, case, this Court declined to give controlling weight to the *Haverhill Manor* decision for the purpose of determining whether a pre-petition claim could be recovered from current post-petition payments. The Court concluded that the automatic stay prevented the Department from making post-petition seizures, finding

[t]he characterization by the Massachusetts Supreme Judicial Court as an 'open account', and its ratification of the offset procedure are not determinative of the issue presented, because absent from *Haverhill Manor* was the element of bankruptcy intervention. Undoubtedly, the offset procedure is a properly exercised, state-created right available to [the Department] prior to bankruptcy. The propriety of the procedure under state law, however, does not legitimize the collection of pre-petition debt by a method improper in bankruptcy.

*Dartmouth House*, 24 B.R. at 262. The Court finds that the Debtors right to recover preferential transfers is as much "an element of bankruptcy intervention" as the automatic stay. Furthermore, if the nursing homes have property interests in funds owed them by the Department which are sufficient to prevent post-petition seizures, it naturally follows that they must have property interests in the funds pre-petition as well. As a consequence, the Court again finds that *Haverhill Manor* is not determinative of the issue presented and that "transfers" took place for purposes of section 547.

### III

With respect to the third element of a preference, insolvency, the Court finds that the Debtors submitted sufficient evidence of the Debtors' insolvency. The Bankruptcy Code defines insolvent as a "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation...." 11 U.S.C. § 101(29)(A). The definition is similar to the definition under section 60 of Bankruptcy Act, the predecessor of 11 U.S.C. § 547. *In re R. Purbeck & Associates, Ltd.,* 27 B.R. 953, 955 (Bankr.D.Conn.1983). As a consequence, cases decided under the Act are informative. The court in *n re Phippens,* 4 B.R. 155, 159 (Bankr.M.D.Tenn.1980) observed: "proof of insolvency ... contemplates a showing of the fair value of all the debtor's property, compiled by the use of balance sheets, financial statements, appraisals, expert testimony, and other affirmative evidence compared to the amount of his debts." Although the burden of proof remains unchanged under the Bankruptcy Code, Code section 547(f) aids the trustee with a presumption of insolvency "on and during the 90 days immediately preceding the date of the filing of the petition." 11 U.S.C. § 547(f). The party against whom the presumption operates must come forward with some evidence to rebut the presumption, but the burden of proof remains upon the trustee (or the debtor-in-possession). 4 L. King, *Collier on Bankruptcy* ¶ 547.2 (15th ed. 1985).

Joseph J. Patts, an accountant for the Debtors, testified that he assisted in the preparation of the bankruptcy schedules and statements of affairs for the Debtors. He indicated that at the times of the filings and in the 90 day periods preceding the filings, the Debtors' liabilities exceeded their assets.

With respect to the Department's solvency defense, it is somewhat unclear to the Court whether the Department is recommending piercing the trust veils directly, or whether it is recommending piercing the Debtors' corporate veils to reach Mikolin-ski's and Accaputo's beneficial interests in the trusts. However, there is no uncertainty relative to the legal standard to be applied in piercing corporate veils. The Massachusetts Supreme Judicial Court has stated that the fiction of corporate separateness should be disregarded only

a) when there is active and direct participation by the representatives of one corporation, apparently exercising some form of pervasive control, in the activities of another and there is some fraudulent or injurious consequence of the intercorporate relationship, or (b) when there is a confused intermingling of activity of two or more corporations engaged in a common enterprise with substantial disregard of the separate nature of the corporate entities, or serious ambiguity about the manner and capacity in which the various corporations and their respective representatives are acting.

*My Bread Baking Co. v. Cumberland Farms, Inc.,* 353 Mass. 614, 619, 233 N.E.2d 748 (1968). The Department has stressed both the pervasive control of the Debtors and the trusts exercised by Mikolinski and Accaputo as well as the confused intermingling of activities between the corporate Debtors and the trusts.

In a leading case from the Fourth Circuit, the court discussed several factors which courts consider in determining whether or not to pierce the corporate veil: (1) gross under capitalization for purposes of the corporate undertaking; (2) failure to observe corporate formalities; (3) nonpayment of dividends; (4) insolvency; (5) siphoning of funds by the dominant stockholder; (6) non-functioning of officers or directors; (7) absence of corporate records; and (8) use of the corporate facade for the operations of the dominant stockholder. *DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.,* 540 F.2d 681, 685–87 (4th Cir.1976); *In re Criswell,* 52 B.R. 184, 194 (Bankr.E.D.Va.1985). The court noted, however, that the decision to disregard the corporate fiction should be made with reluctance and caution and that the party seeking to establish shareholder liability

has the burden of proof. According to the court, "the conclusion to disregard the corporate entity may not rest ... on a single factor ... but must involve a number of such factors; in addition it must present an element of injustice or fundamental unfairness." *Dewitt*, 540 F.2d at 683, 687.

During the trial and particularly during the examination of Mikolinski, the Department touched on virtually every one of the foregoing factors. However, the Department failed to demonstrate any fraudulent or injurious consequences to it or any element of injustice or fundamental unfairness with respect to it. The Department was fully apprised of the relationships involving the Debtors, the trusts, Management and Accaputo and Mikolinski as a result of the RSC–2's and RSC–3's filed with it over at least a four year period.

■ Nevertheless, the Court need not decide whether or not the corporate veils of the Debtors should be pierced. Assuming *arguendo*, that piercing the corporate veils of the Debtors is the proper approach, the Department has failed to conclusively establish that the Debtors would be solvent if the trust properties were included in the Debtors estates.

Mikolinski admitted that the current property valuation by the Town of Plainville for the real estate owned by the AA Trust and used by Senior Care is $534,300. Likewise, he admitted that the current property valuation by the City of Somerville for the real estate owned by the WJM Trust is $930,000. However, the Department did not establish that the valuations of these governmental units was indicative of the fair market value of the properties. Mr. Patts, a licensed real estate agent testifying for the Debtors, stated that nursing homes are bought and sold in accordance with their rate-setting bases because an investor could not recover an investment in excess of what the Commonwealth reimburses for rental expense, apparently presuming ownership of the real estate by a trust or other entity separate from the nursing home. Accordingly, he testified that Winter Hill and Plainville would sell

for approximately $400,000 each. More importantly, he testified that from his experience preparing the Debtors' RSC–1's and RSC–2's the mortgages and real estate taxes for both trust properties exceed their rate setting bases. Thus, according to Patts, even if the properties were considered assets of the corporations, the Debtors would still be insolvent.

The Department attempted to counter this testimony with that of David Hines, Jr., a supervisor of audits with the Bureau of Longterm Care at the Massachusetts Rate Setting Commission. He testified that nursing homes are sold at twice or greater than the reimbursable basis that the Massachusetts Rate Setting Commission sets because of the presence of additional payors. In short, Mr. Hines suggested that homes with private patients generate more income than those serving Medicaid patients. Despite this testimony, the Court is not persuaded that the real estate would command sums greater than those indicted by Mr. Patts at the present time because it is undisputed that the homes serve almost exclusively Medicaid patients. In view of the uncertain value of the real estate and the fact that the amounts outstanding on the three mortgages were not revealed with certainty, the Court finds that the Department's attempt to prove solvency by piercing the corporate veils failed. Although the Court does not condone the apparent cupidity of Mikolinski and Accaputo, it is compelled to find that the Debtors have established all the requisite elements to sustain a preference action.

### IV

■ The Department argues that even if the setoffs are found to be preferential transfers, they are not subject to avoidance because they fall within the exception established by 11 U.S.C. § 547(c)(2). That section provides:

(c) The trustee may not avoid under this section a transfer—

(2) to the extent that such transfer was—

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms.

11 U.S.C. § 547(c)(2).

The perimeters of normal business practice have been interpreted to mean that:

only unusual or abnormal actions by the parties to collect or pay on an existing debt are proscribed. Actually the requirement that the creditor show that the transaction was conducted in the ordinary course of business should usually be easy to meet. Since this showing is required merely to assure that neither the debtor nor the creditor does anything abnormal to gain an advantage over other creditors, an extensive showing that such transactions occurred often, or even regularly, is not necessary. The transaction need not have been common; it need only be ordinary. A transaction can be ordinary and still occur only occasionally.

*In re Economy Milling Co. Inc.*, 37 B.R. 914, 922 (D.S.C.1983) (footnote omitted). While the Department, relying on the second affidavit of Norman Flora, suggests that its claims are an ordinary, even inevitable, byproduct of the retrospective payment system and that the offsets were effected automatically by the Department's automated payment system, the Debtors' correctly perceive the flaw in the Department's rationale. The seizures were simply not made because of any debts incurred by the Debtors. Rather, the debts were incurred by Rockview and WMI. Furthermore, there was no evidence presented by the Department to prove that the Debtors, in the ordinary course of their businesses, paid the debts of WMI and Rockview. Thus, the ordinary course of business defense is unavailable to the Department.

In view of the foregoing, the memoranda and arguments of counsel, whether or not specifically mentioned herein, and the entire record of the case, the Court enters judgment against the Department and in favor of the Debtors on Count IV of the complaint. Accordingly, the Department is ordered to immediately turnover to Senior Care the sum of $13,094.14 and to WJM the sum of $56,646.36.