In re **OEM INDUSTRIAL CORPORATION,** Debtor.

**OEM INDUSTRIAL CORPORATION,** Plaintiff,

v.

**BIRMINGHAM SQUARE, a Pennsylvania partnership,** Defendant.

Bankruptcy No. 90–03906 JKF. Adv. No. 91–0148.

United States Bankruptcy Court, W.D. Pennsylvania.

Dec. 23, 1992.

Gary W. Short, Pittsburgh, PA, for debtor.

James R. Cooney, Nernberg & Cooney, P.C., Pittsburgh, PA, for Birmingham Square.

James A. Prostko, Pittsburgh, PA, trustee.

## MEMORANDUM OPINION

JUDITH K. FITZGERALD, Bankruptcy Judge.

The matter before the court is an avoidance action by which OEM Industrial Corp. ("OEM"), formerly acting as debtor-in-possession,[1] seeks to avoid as a preferential transfer Birmingham Square's execution lien[2] on a judgment it held against OEM. We hold that Birmingham Square's lien is an avoidable preference.

### I. Background

On Feb. 15, 1985, OEM, as lessee, executed a lease agreement with Birmingham Square. On or about October 6, 1988, after OEM's default under the lease, Birmingham Square confessed judgment against OEM for $106,094.40 and for possession of the premises. Following unsuccessful attempts to recover the debt under a settlement, Birmingham Square initiated execution proceedings against OEM on July 25, 1990. On November 29, 1990, Birmingham Square caused a writ of execution to be reissued on the aforementioned judgment, naming AEG Westinghouse Transportation, Inc. ("AEG Westinghouse"), as garnishee. On December 4, 1990, Birmingham Square caused the reissued writ of execu-

tion and interrogatories to garnishee to be served upon AEG Westinghouse, attaching AEG Westinghouse's indebtedness to OEM in the amount of $15,785.55. That sum, plus accrued interest, for a total of $16,319.35, was paid into court and less $1,120.00 paid out as costs and attorneys' fees to AEG Westinghouse, is now in escrow pursuant to an interpleader action. *See In re OEM Industrial Corp.*, 135 B.R. 247, 251 (Bankr.W.D.Pa.1991).

OEM contends that Birmingham Square's judgment lien is an avoidable preferential transfer of an interest in OEM's property to or for the benefit of its creditor, Birmingham Square, for or on account of an antecedent debt, made on or within 90 days before the filing of the chapter 11 petition while OEM was insolvent, and which enables Birmingham Square to receive more than it would receive if the case were a case under chapter 7, the transfer had not been made, and Birmingham Square received payment of such debt to the extent provided by the provisions of Title 11. 11 U.S.C. § 547(b).

### II. Discussion.

#### A. Section 547(b)(3).

Birmingham Square contends that OEM was not insolvent on December 4, 1990, the date of the transfer, and that Birmingham Square would not receive more as a result of the garnishment than it would receive if the case were a case under chapter 7. The parties do not dispute the satisfaction of the other conditions of § 547(b), and they will not be discussed herein.

■ While the burden of proof in a preference action lies with the trustee or debtor-in-possession, 11 U.S.C. § 547(g), § 547(f) of the Bankruptcy Code creates a presumption of the debtor's insolvency for the ninety days preceding the bankruptcy. 11 U.S.C. § 547(f). However, if the transferee against whom the presumption is

---

1. After this adversary proceeding was tried, the case was converted to chapter 7 and James A. Prostko, Esq., was appointed as the trustee.

2. Under Pennsylvania law, Birmingham Square's execution lien came into being on the date on which the sheriff served the writ of execution upon the garnishee, AEG Westinghouse Transportation, Inc., pursuant to Pa. R.Civ.P. 3137(b). Goodrich Amram 2d § 3137(b):1 (1977).

sought to be invoked comes forward with "some evidence to rebut the presumption," the burden of proof remains on the trustee or debtor-in-possession in whose favor the presumption exists. *Notes of Committee on the Judiciary,* S.Rep. No. 95–989, 95th Cong., *reprinted at* 1978 *U.S.Code Cong. & Ad.News* at 5787. Therefore, if Birmingham Square met or rebutted the presumption of insolvency by adducing at trial some evidence that OEM was solvent on the date of the alleged voidable transfer, then OEM, bearing the ultimate burden of proof on this issue, would have had to prove by a preponderance of the evidence that it was insolvent on the date of the transfer. *See In re Koubourlis,* 869 F.2d 1319, 1322 (9th Cir.1989).

Although "proof of insolvency ... contemplates a showing of the fair value of all the debtor's property, compiled by the use of balance sheets, financial statements, appraisals, expert testimony, and other affirmative evidence and compared to the amount of his debts," because of the presumption of insolvency, absence of such evidence in OEM's case in chief is not fatal. *In re Phippens,* 4 B.R. 155, 159 (Bankr. M.D.Tenn.1980). As evidence of OEM's insolvency on December 4, 1990, the date of Birmingham Square's garnishment of AEG Westinghouse, OEM offered the schedules filed with its petition seven days later, on December 11, 1990, and amended schedules, to show that OEM's debts exceeded its assets by $309,507.00. *See* Plaintiff's Exhibits 1, 1A, & 1B. Additionally, in or-

der to establish its insolvency on the date of the transfer, OEM offered a certified record of the claims docket (Plaintiff's Exhibit 2), a certified proof of claim by the Internal Revenue Service which asserts that debtor is indebted to the United States in the sum of $158,966.28 (Plaintiff's Exhibit 3), and its 1990 federal tax return (Plaintiff's Exhibit 4). Faye Johnson, president of OEM, was the only witness for OEM. She testified that the schedules and other exhibits were accurate reflections of OEM's assets and liabilities on the relevant dates of December 4 and December 11, 1990. She also testified as to values of assets.[3]

■ OEM presented no documentary evidence other than its schedules which nevertheless provided sufficient evidence to support the statutory presumption of insolvency at the time of Birmingham Square's garnishment. Birmingham Square sought to rebut the presumption of insolvency by the introduction of two balance sheets showing that OEM was solvent on or near December 4, 1990, and of OEM's 1990 tax return which showed gross sales for 1990 which, Birmingham Square alleged, were not sufficiently accounted for in the bankruptcy schedules. Birmingham Square's contention that OEM's balance sheets were the most reliable evidence of OEM's financial status is unfounded because witnesses credibly testified that those balance sheets were inaccurate.[4]

---

3. Birmingham Square objected to Johnson's testimony regarding liquidation values of the assets on December 4, 1990, on the ground that determination of insolvency must be made on a going concern, not liquidation, basis if the entity is still a going concern. *See In re Davis,* 120 B.R. 823, 825–26 (Bankr.W.D.Pa.1990). Nevertheless, OEM offered proof of insolvency from the vantage of a going concern valuation, as demonstrated by Plaintiff's Exhibit 1A, which Johnson testified was accurate. Even under a going concern valuation, OEM's debts were greater than its assets at the time of the transfer. Birmingham Square also objected to omission from debtor's schedules of "leasehold improvements" included in OEM's balance sheets. *See* Johnson Deposition Exhibit 2; Plaintiff's Exhibit 4. However, Birmingham Square did not establish that, by virtue of including the leasehold improvements as assets, OEM would have

been solvent on the date of the transfer, and thus did not rebut the presumption of insolvency.

4. Birmingham Square's reliance on *Old World Cone* for the proposition that balance sheets are the most reliable measure of solvency in a preference action is misplaced. *See In re Old World Cone,* 119 B.R. 473, 478 (Bankr.E.D.Pa.1990). Testimony in *Old World Cone* showed that one of two competing balance sheets was "probably" correct. The defendant to the preference action testified that he had signed the debtor's schedules in blank. *Id.* at 475. Thus, the court found that the schedules were inconclusive as evidence of insolvency and one balance sheet was the most credible evidence. *Id.* at 478. No like evidence casts doubt on OEM's schedules.

### 1. *Balance Sheet dated 12/31/90.*

Birmingham Square called as a witness Thomas Price, employee of OEM and preparer of its 1990 tax return, who testified regarding a balance sheet denominated "OEM Industrial Corp. Balance Sheet 12/31/90." Plaintiff's Exhibit 4 at 5. The balance sheet was appended to the 1990 tax return and showed assets exceeding liabilities by $20,715.52 as of December 31, 1990, less than one month after the alleged preferential transfer. Although the balance sheet was dated December 31, 1990, twenty days post-petition and twenty-seven days post-transfer, the evidence was used by Birmingham Square to rebut Debtor's contention that it was insolvent on the date of the transfer. Price testified that, using a computer program, Price generated or caused to be generated the December 31, 1990, balance sheet. *See* Defendant's Exhibit G. Because the data in the program was not current, the 1990 balance sheet as generated was not accurate. Price testified that he had told Paul Wilding, OEM's former chief financial officer, not to include the December 31, 1990, balance sheet with the 1990 tax return because of its inaccuracy.[5]

Birmingham Square contends, nevertheless, that the December 31, 1990, balance sheet showing a positive net worth is conclusive on the issue of insolvency because it was admitted into evidence as part of the tax return on behalf of OEM, relying on *In re Philadelphia Light Supply Co.*, 33 B.R. 734 (Bankr.E.D.Pa.1983), as its support. However, rather than holding that a balance sheet admitted into evidence on behalf of a party is conclusive on the issue of solvency, the court in *Philadelphia Light* merely expressed astonishment that a party in that case introduced into evidence two contradictory exhibits on the issue of insolvency. 33 B.R. at 737. The December 31, 1990, balance sheet is not conclusive on the issue of insolvency despite the fact that it is part of an exhibit introduced by OEM. The court finds that Price's testimony that the December 31, 1990, balance sheet was

generated from a program which had not been updated with current financial data was credible. The witnesses and documents substantiated that Debtor's record keeping practices were in a shambles and Price's testimony is further supported by the other evidence.

### 2. *Balance Sheet of 8/31/90.*

Paul Wilding, OEM's former Chief Financial Officer, Treasurer, and member of the Board of Directors, was deposed by Birmingham Square regarding a document which combined balance sheets of December 3, 1989, and August 31, 1990. Deposition Exhibit 6. The August 31, 1990, column shows assets exceeding liabilities by $77,512.92. Wilding stated that he generated the August 31, 1990, balance sheet by extrapolating from the December 3, 1989, balance sheet, without consulting financial records and without performing an audit. The extrapolated balance sheet of August 31, 1990, is at best speculative regarding OEM's solvency on the date of the transfer, and, as such, is not sufficient to overcome the presumption of insolvency. *Cf., In re Koubourlis*, 869 F.2d at 1322, citing *Matter of Emerald Oil Co.*, 695 F.2d 833, 839 (5th Cir.1983) (speculative proof of solvency, such as simply questioning accounting, is not sufficient to overcome the presumption of insolvency). Additionally, Johnson testified, and we accept her testimony, that specific items in the August 31, 1990, balance sheet were inaccurate.

### 3. *1990 Tax Return.*

Birmingham Square contends that, because OEM passed approximately $550,000 through its bank account in 1990, and its 1990 tax return reveals that it had sales well in excess of $9,000,000, OEM failed to account for all of its funds. *See* Plaintiff's Exhibit 4. Faye Johnson and Thomas Price explained the discrepancies. They testified regarding OEM's business relationship with Bombardier, Inc., for which OEM assembled bogies, explaining that OEM had to bid for the entire cost of a bogie but was

---

**5.** Price testified that he did not generate a corrected balance sheet for the 1990 tax return because IRS regulations did not require a balance sheet.

paid only for the assembly services. The result, reflected on the 1990 tax return, was approximately $8.5 million dollars in cost of goods sold and only $493,563 in income. The court credits this testimony which accounts for the apparent discrepancy between gross sales and cash receipts.

The court finds as a matter of law that Birmingham Square's evidence regarding the August and December 1990 balance sheets and the 1990 tax return failed to overcome the presumption that OEM was insolvent on the date of transfer.

■ Birmingham Square also challenges OEM's insolvency on grounds relating to alleged fraudulent conveyances by OEM to affiliated companies. Birmingham Square's complaint centers on its contention that OEM deposited sizeable funds with affiliated companies. We turn to these arguments.

Under a misreading of the definition of "insolvent," 11 U.S.C. § 101(32), Birmingham Square argues the erroneous premise that the determination of insolvency must include consideration of a number of alleged fraudulent transfers OEM made to affiliated companies, including money put into an affiliated company's bank account,[6] Defendant's Exhibit B at ¶¶ 9, 11, and transactions whereby affiliated companies Allegheny Allied and Allegheny Fabricating paid for C.O.D. shipments of goods and supplies to OEM.[7]

Birmingham Square insists that those transfers must be accounted for as assets of OEM. The definition of "insolvent" provided by the Bankruptcy Code clearly excludes from the determination of insolvency transfers made with the intent to hinder, delay, or defraud creditors:

"insolvent" means—(A) with reference to an entity other than a partnership and a municipality, financial condition such

that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, *exclusive of—(i) property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors;*

11 U.S.C. § 101(32) [emphasis added].

This definition is "the traditional bankruptcy balance sheet" definition, and is adopted from the former Bankruptcy Act. *Notes of Committee on the Judiciary,* S.Rep. No. 95–989, 95th Cong., *reprinted in* 1978 *U.S.Code Cong. & Ad.News* at 5787. Thus, pre-Code decisions and commentary construing it are helpful in our understanding of the Code's definition. *See In re R. Purbeck & Associates, Ltd.,* 27 B.R. 953, 954–55 (Bankr.D.Conn.1983). A long line of Bankruptcy Act opinions construing the exclusionary clause of the definition of "insolvent" makes short work of the argument that "exclusive" means "inclusive." *See, e.g., Lincoln Theatres Corp. v. Fleming,* 66 F.2d 441, 443 (4th Cir.1933); *Brickell v. Bond Realty Corporation,* 36 F.2d 865, 867 (5th Cir.1930). *See also* 1 *Collier on Bankruptcy* ¶ 1.19[2] at n. 40 (14th ed. 1988) (citing cases).

Contrary to the statutory language and case law, Birmingham Square argues that "exclusive" means that the determination of OEM's insolvency on the date of the alleged voidable transfer must include any property which was transferred to hinder, delay, or defraud creditors. Otherwise, Birmingham Square continues, a debtor could use the definition of "insolvent" in connection with § 547(b) to fraudulently convey assets pre-petition and, with impunity, subsequently void transfers to creditors as preferences upon filing a bankruptcy petition. However, the impediment to creditors created by this definition has been clearly recognized. This "single express

---

6. OEM admitted that from June through December 8, 1990, in order to avoid using its Mellon Bank account which was attached by Birmingham Square at the time, it made use of the bank account of Allegheny Allied, a related company. Birmingham Square's attachment of OEM's Pittsburgh bank account predated the attachment of AEG Westinghouse at issue in the present action.

7. OEM claims that, in turn, it purchased the supplies and goods from Allegheny Allied and Allegheny Fabricating and that all transfers of assets were in consideration of OEM's purchases from the related companies.

exclusion" of the definition of insolvency "denies ... a creditor who has received a preference ... the benefit of adding such property to the assets side of the comparison test." 1 *Collier on Bankruptcy* ¶ 1.19[2.1] (14th ed. 1988). The Code contains no exception to the operation of the exclusionary clause when the issue of solvency is raised by creditors. Thus, Birmingham Square's argument that the transfers allegedly made by OEM with intent to hinder, delay, or defraud creditors must be added back into the assets side of the balance sheet insolvency test must fail. The definition of insolvency in § 101(32) specifically excludes such assets from the calculation.

Furthermore, Birmingham Square asks the court to pierce the corporate veil of OEM to reach the assets of its affiliated companies. Birmingham Square alleges that Johnson's ownership, control, and position as a corporate officer of OEM and its affiliated companies, in addition to the alleged fraudulent transfers between companies, and the admitted commingling of assets in the Allegheny Allied bank account are standard hallmarks of alter ego theory which justify piercing the corporate veil.

■ Even if the alter ego theory may be used defensively in a preference action, Birmingham Square did not plead such a theory or meet the requisite burden of proof to establish it. Further, it failed to adduce evidence that the assets of OEM's affiliates, when added to OEM's assets, would establish OEM's solvency on the date of the preferential transfer. *See, In re WJM, Inc.,* 65 B.R. 531, 541 (D.Mass. 1986), *aff'd, WJM, Inc. v. Mass. Dept. of Public Welfare,* 840 F.2d 996 (1st Cir.1988).

The defensive use of alter ego or "corporate disregard" theory is not necessarily prohibited. *See, e.g., Pan Eastern Exploration Co. v. Hufo Oils,* 855 F.2d 1106, 1135 (5th Cir.1988) (citing Texas cases). However, in this case, the alter ego theory was not articulated until Birmingham Square's closing argument. Birmingham Square's Answer, Pre-trial Statement, and opening argument were silent on the issue. OEM could not be expected to discern from the pleadings or the trial itself that Birmingham Square would ask the court to disregard OEM's corporate form at closing argument. Undoubtedly, elements of Birmingham Square's proof with respect to OEM's alleged fraudulent transfers coincidentally support disregard of the corporate form. However, OEM's " '[i]mplied consent may not be inferred merely because evidence relevant to a properly pleaded issue incidentally tends to prove a fact not within the pleadings.' " *United States v. Van Diviner,* 822 F.2d 960, 964 (10th Cir. 1987) citing *Ellis v. Arkansas Louisiana Gas Co.,* 609 F.2d 436, 440 (10th Cir.1979), *cert. denied,* 445 U.S. 964, 100 S.Ct. 1653, 64 L.Ed.2d 239 (1980).

> Rule 15(b) of the Federal Rules of Civil Procedure permits issues not raised by the pleadings to be tried by the express or implied consent of the parties. Implied consent may be found when "the parties recognized that the issue entered the case at trial and acquiesced in the introduction of evidence on that issue without objection." *Hardin v. Manitowoc–Forsythe Corp.,* 691 F.2d 449, 457 (10th Cir.1982). The determination whether an issue has been tried by implied consent is within the sound discretion of the trial court. *Id.* at 457.

*Van Diviner,* 822 F.2d at 964. After review of the pleadings and the trial, we find that OEM did not have sufficient notice, if any, that Birmingham Square expected OEM to defend the integrity of its corporate status. We further find that there was no implied consent to trial of the issue of alter ego theory in that OEM did not acquiesce without objection to the introduction of evidence on that issue because the issue did not enter the case at trial.

Even if Birmingham Square had provided sufficient notice of its defensive use of alter ego theory, it did not offer any evidence to show, upon piercing the corporate veil, that the additional assets were sufficient to prove that OEM was solvent at the time of the garnishment. *See* 11 U.S.C. §§ 101(32), 347(b)(3). *In re WJM, Inc.,* 65 B.R. 531 (Bankr.D.Mass.1986), involved a preference action which turned on the de-

termination of insolvency. The court examined the defendant's alter ego analysis under Massachusetts law and concluded that it

> need not decide whether or not the corporate veils of the Debtors should be pierced. Assuming *arguendo,* that piercing the corporate veils of the Debtors is the proper approach, the [Plaintiff] has failed to conclusively establish that the Debtors would be solvent if the trust properties were included in the Debtors [sic] estate.

65 B.R. at 541, *aff'd, WJM, Inc. v. Mass. Dept. of Public Welfare,* 840 F.2d 996 (1st Cir.1988).

Birmingham Square further grounds its argument that the court must consider any assets which OEM transferred to its related companies on the well established principle that "property of the [d]ebtor in the possession, custody and control of its alter ego comprises property of the estate at the commencement of the case." *In re F & C Services, Inc.,* 44 B.R. 863, 868 (Bankr. S.D.Fla.1984) (citations omitted). *See* Birmingham Square's Proposed Findings of Fact, Conclusions of Law and Supplemental Brief at 11. However, property included in the calculation of insolvency is not coextensive with property of the bankruptcy estate. *Compare* 11 U.S.C. § 101(32) with 11 U.S.C. § 541. As discussed above, insolvency is determined exclusive of all fraudulent transfers. Even if Birmingham Square had successfully proven the existence of fraudulent transfers by OEM to related companies, which it did not, such property would be excluded from the determination of OEM's solvency on the date of AEG Westinghouse's garnishment by virtue of the definition of insolvency. 11 U.S.C. § 101(32).

### B. Section 547(b)(5)

█ Birmingham Square further contends that its garnishment of AEG Westinghouse cannot be voided as a preference because Debtor cannot prove that Birmingham Square received more than it would under chapter 7. OEM's schedules, as amended, list $187,947.32 in total assets. There are claims against the estate totalling $426,672.61, of which approximately $77,935.64 represents priority taxes. Secured claims total $175,554.40. Thus, $253,490.04 in claims have payment priority ahead of Birmingham Square's claim and there would be no distribution to Birmingham Square under a chapter 7 liquidation. Birmingham Square argues that the court cannot make the above hypothetical distribution of assets in order to determine if Birmingham Square received, via its garnishment, more than it would have if the case had been filed under chapter 7, relying on *In re Rodriguez,* 50 B.R. 576 (Bankr. E.D.N.Y.1985). In that case, the court could not construct a hypothetical distribution to creditors until conclusion of a pending fraudulent conveyance action against debtor's spouse, which action had the potential of providing 100 per cent distribution to all creditors. Here, there is no pending fraudulent conveyance suit and none ever was brought, even though this bankruptcy was filed more than two years ago. The issue of fraudulent conveyances arises only by virtue of Birmingham Square's defensive allegations to this preference suit. Thus, based on the evidence before us, this court has no difficulty constructing a hypothetical distribution to creditors and finds that Birmingham Square, by virtue of its garnishment of AEG Westinghouse's indebtedness to OEM, received more than it would under chapter 7.

For the foregoing reasons, the court finds that a voidable preference exists with respect to Birmingham Square's December 4, 1990, garnishment of AEG Westinghouse's indebtedness to OEM. The balance of the interpleader fund in escrow shall be paid to the trustee of OEM by the Clerk of the Bankruptcy Court.

An appropriate order will be entered.

### JUDGMENT ORDER

AND NOW, to wit, this 23rd day of December, 1992, for the reasons expressed in the foregoing Memorandum Opinion, it is ORDERED that:

1. Birmingham Square's execution lien, is hereby avoided as a preference; and

2. Judgment is hereby entered in the amount of the interpleaded funds, $15,199.35 plus interest, less any applicable Registry Fund fee, in favor of the Chapter 7 Trustee, James A. Prostko, Esq., for the Estate of Debtor, and against Birmingham Square.

3. The Clerk shall pay to the Trustee of the Estate of Debtor, OEM Industrial Corporation, the amount designated in ¶ 2 above.

The Clerk shall close this Adversary.